UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORETTA WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>DDR MEDIA, LLC, *et al*.,<br><br>Defendants. | Case No. 22-cv-03789-SI<br><br>**ORDER DENYING DEFENDANTS' JOINT MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 29 |

On February 17, 2023, the Court held a hearing on defendants' joint motion to compel arbitration. For the reasons set forth below, the Court DENIES the motion.

### BACKGROUND

On June 27, 2022, Loretta Williams filed a class action complaint against defendants DDR Media LLC and Lead Intelligence Inc., d/b/a/ Jornaya, alleging that defendants violated the California Invasion of Privacy Act, Cal. Penal Code § 631,[1] and California's Unfair Competition Law, and invaded Williams's and class members' privacy rights under the California Constitution. Williams alleges that defendants unlawfully recorded her electronic communications or interactions with DDR Media's website "SnappyRent2own.com" when she used the website on or around December 10, 2021. Compl. ¶¶ 20–24 (Dkt. No. 1).

According to the complaint, Jornaya offers a product called "TCPA Guardian" to lead generators and telemarketers. *Id.* ¶ 5. The product is "designed to allow these lead generators and

---

[1] The California Invasion of Privacy Act criminalizes the use of a recording device to "read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication" without the consent of all parties to the communication. Cal. Penal Code § 631.

telemarketers to attempt compliance with the federal Telephone Consumer Protection Act by documenting alleged evidence of prior express consent to receive telemarketing calls provided on websites." *Id*. One feature of TCPA Guardian is a "visual playback" function, which records, in real time, a person's interactions with a website that is using TCPA Guardian. *Id*. ¶ 6. DDR Media installed TCPA Guardian by embedding Jornaya's code onto the SnappyRent2own.com website. *Id*. ¶ 11.

Williams alleges that when she visited SnappyRent2own.com on December 10, 2021, "the Jornaya TCPA Guardian replay function created a video that captured Williams' keystrokes and clicks on the website." *Id*. ¶ 21. TCPA Guardian also captured the date and time of the visit, her IP address, and her geographic location, as well as Williams' name, address, and phone number. *Id*. ¶¶ 21–23. Williams alleges that the recording was done without her consent, and that defendants did not inform website visitors that their strokes and clicks would be recorded. *Id*. ¶ 24.

On December 15, 2022, defendants filed a joint motion to compel arbitration based upon an arbitration agreement contained in the Terms of Use on the SnappyRent2Own.com website. Defendants have submitted pictures of the website, which they implicitly represent is the version of the website that Williams accessed.[2] *See* Swaminathan Decl., Ex. 1 (Dkt. No. 29-2). The hyperlink to the Terms of Use is on lines sixteen and seventeen of twenty-one in a full-justified paragraph of text.[3] *See id.*; *see also* Appendix A. The paragraph states,

> By clicking the "Get Started" button, I am agreeing by my electronic signature to give SnappyRent2Own, NHAProgram, and its partners my prior express written consent and permission to send emails, as well as to call and send to me recurring text messages at the cellphone number(s) I provided above and to any other subscriber or user of these cellphone number(s), using an automated dialing system at any time from and after my inquiry to

---

[2] The Court accessed the SnappyRent2Own.com website on February 22, 2023. On that day, the website differed from the version depicted in defendants' briefing in significant ways, including the absence of a long paragraph— or any language—stating that by taking any particular action on the website, such as clicking a button, the user was agreeing to the Terms of Use.

[3] The paragraph also contains a hyperlink to a Privacy Policy. While the Privacy Policy is not directly at issue in this motion, defendants emphasize that the Privacy Policy discloses that the website is collecting users' personally identifying information. Williams asserts that the hyperlink displayed to access the Privacy Policy is not functioning. Peluso Decl. ¶ 3 (Dkt. No. 31-1).

> SnappyRent2Own, NHAProgram for purposes of all federal and state telemarketing and Do-Not-Call laws, in each case to market to me products and services and for all other purposes. I understand that my telephone company may impose charges on me for these contacts. I understand that my consent is not required to buy any of these business's products or services and it can be revoked at any time. For SMS message campaigns: text STOP to stop and HELP for help. Terms & Conditions/privacy policy apply. In addition, I agree to the <u>Terms of Use</u> and the <u>Privacy Policy</u>. I also authorize the auto dealers and financial institutions that receive my request to order my credit report to determine my creditworthiness. I understand that SnappyRent2own.com, NHAProgram does not make credit decisions and is not a lender or broker.

*Id*. The text of the entire paragraph is darker gray on a lighter gray background. *Id.* The Terms of Use hyperlink is underlined, but otherwise is in the same style and color as the surrounding words. *Id.* Above the paragraph containing the Terms of Use hyperlink are four white data fields, which contain font approximately two times the size[4] of the Terms of Use hyperlink font, where users are prompted to fill in their contact information (first name, last name, phone number, and email address). *Id.* Below the Terms of Use hyperlink paragraph is a large "CHECK LISTINGS" button. *Id.* The button is blue and the text within it is white, in all caps, and the font is approximately two to three[5] times the size of the Terms hyperlink font. *Id.* Below the "CHECK LISTINGS" button are photos of listings and their locations. *Id.* Below the photos is a "Get Started Today" button, which is the same size as the "CHECK LISTINGS" button. *Id.* The "Get Started Today" button is blue, the text within the button is white, and the font is approximately two to three times the size of the Terms hyperlink font. *Id.* The Terms of Use hyperlink leads to a page titled "Terms and Conditions." Dkt. No. 29-3. The Terms and Conditions document is seven pages and is mostly single-spaced. *Id.* The arbitration agreement appears on page five of seven. *Id.* at 5.

## LEGAL STANDARD

A party seeking to compel arbitration bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *Johnson v. Walmart Inc.*, 57 F.4th 677,

---

[4] The Terms of Use hyperlink font is 1/16th of an inch while the font in the data fields is 1/8th of an inch.

[5] The font of the "CHECK LISTINGS" button measures between 1/8th and 1/4th of an inch.

681 (9th Cir. 2023). The Federal Arbitration Act ("FAA") "requires federal district courts to stay judicial proceedings and of claims covered by a written and enforceable arbitration agreement." 9 U.S.C. § 3; *Nguyen v. Barnes & Nobel Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). "The FAA limits the district court's role to determining whether a valid arbitration agreement exists, and whether the agreement encompasses the disputes at issue." *Nguyen*, 763 F.3d at 1175. "In determining whether a valid arbitration agreement exists, federal courts 'apply ordinary state-law principles that govern the formation of contracts.'" *Id.*[6]

## DISCUSSION

Before analyzing whether Williams agreed to arbitrate her claims, it is helpful to understand the type of contract contained on the SnappyRent2Own.com website. The Ninth Circuit has explained,

> Contracts formed on the Internet come primarily in two flavors: "clickwrap" (or "click-through") agreements, in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use; and "browsewrap" agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen.

*Id*. at 1175–76. "Courts routinely find clickwrap agreements enforceable." *Oberstein v. Live Nation Ent., Inc*., __ F.4th __, No. 21-56200, 2023 WL 1954688, at *5 (9th Cir. Feb. 13, 2023). "Courts are generally reluctant to enforce [browsewrap] agreements because they often leave users 'unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms.'" *Id.* (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)). "When an online agreement falls between these two extremes, courts analyze mutual assent under an objective-reasonableness standard." *Id.*

The agreement here falls somewhere between a clickwrap and a browsewrap agreement. A user is not required to click an "I agree" button after being shown the website's Terms and Conditions, but the website does inform users that if they click a button (the "Get Started" button),

---

[6] The parties' briefing assumes California law applies to this analysis. *See* Dkt. Nos. 29–32. Accordingly, the Court will apply California law to determine whether a valid arbitration agreement exists.

4

they agree to the Terms of Use. Regarding the enforceability of these types of agreements, the Ninth Circuit has instructed:

> Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

*Berman*, 30 F.4th at 856 (applying California law).

Defendants do not contend that Williams had actual notice. Instead, they argue that she had inquiry notice because the website provided reasonably conspicuous notice of the Terms of Use, and the Terms of Use hyperlink is conspicuous when viewed in the context of the website. Williams contends that the notice of the Terms of Use is not reasonably conspicuous and that defendants have not shown that she took any action that unambiguously manifested her assent to those terms.

**I.      Reasonably conspicuous notice**

Reasonably conspicuous notice requires that: (1) the "notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent internet user would have seen it," and (2) the hyperlink to the terms and conditions "must be readily apparent" to a reasonably prudent user. *Id.* at 856–57.

**A.      Font size and format of notice**

Defendants contend that the notice disclosing the Terms of Use is conspicuous because it is "primarily surrounded by text no larger than the notice itself" and it is "above the button to proceed, meaning that a user cannot continue to use the next page without at least scrolling past" the Terms of Use hyperlink. Dkt. No. 32 at 3. Defendants assert that the website in this case is "materially indistinguishable" from the website in *Pizarro v. QuinStreet, Inc.*, Case No. 22-cv-02083-MMC, 2022 WL 3357838 (N.D. Cal. Aug. 15, 2022), in which Judge Chesney of this court enforced an arbitration agreement contained in a website's Terms of Use.

In *Pizarro*, the plaintiff visited the defendant's website and input personal information in a

5

form and clicked a "See My Rates" button under the form. *Pizarro*, 2022 WL 3357838, at *2. The defendant argued that by clicking the "See My Rates" button, Pizarro agreed to arbitrate her claims because directly underneath the "See My Rates" button, the website notified users that "By clicking See My Rates you agree to the following," including the Terms of Use containing an arbitration agreement. *Id.* at *1–2. Judge Chesney held that the arbitration agreement was enforceable because the website provided reasonably conspicuous notice of the Terms of Use:

> QuinStreet's textual notice and Terms of Use hyperlink, when viewed in the context of the overall design and content of the webpage, are "reasonably conspicuous" . . . . In particular, the notice and hyperlink appear directly below the "See My Rates" button, are set off by ample white spacing, and are primarily surrounded by text no larger than the notice itself. Further, the general design of the webpage, which is comprised of only two data fields, is relatively uncluttered and has a muted, and essentially uniform, color scheme.

*Id.* at *3; *see* Appendix C (*Pizarro* website).

Williams argues the website here does not provide reasonably conspicuous notice of the Terms of Use because the notice is in tiny gray font on a lighter gray background while other elements of the website are in much larger font with contrasting color backgrounds. Williams contends that the SnappyRent2Own.com website is similar to the browsewrap agreement in *Berman* that the Ninth Circuit held unenforceable.

In *Berman*, the plaintiffs visited two of the defendants' websites. The websites differed in certain respects, but both "contained a set of hyperlinked terms and conditions that included a mandatory arbitration provision." *Berman*, 30 F.4th at 853. Both plaintiffs clicked on a "continue" button found on the websites, and defendant argued that in doing so, the plaintiffs had agreed to the terms and conditions. *Id.* at 857. The Ninth Circuit described the layout of one of the websites as follows:

> [T]he webpage she saw stated, in large orange letters across the top of the page, "Welcome back, stephanie!" In the middle of the screen, the webpage proclaimed, "Getting Free Stuff Has Never Been Easier!" and included brightly colored graphics. In between those two lines of text appeared a box that stated at the top, "Confirm your ZIP Code Below," followed immediately by a pre-populated text box displaying the zip code 93930. Below that, the page displayed a large green button inviting Hernandez to confirm the accuracy of the zip code so that she could proceed to the next page in the website flow. The text inside the button stated, in easy-to-read white letters, "This is correct, Continue! >>" . . . .

> Between the comparatively large box displaying the zip code and the large green "continue" button were two lines of text in a tiny gray font, which stated: "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy." The underlined phrases "Terms & Conditions" and "Privacy Policy" were hyperlinks, but they appeared in the same gray font as the rest of the sentence, rather than in blue, the color typically used to signify the presence of a hyperlink.

*Id.* at 853–54 (internal citation omitted).[7] The Ninth Circuit held that the text disclosing the Terms and Conditions was not conspicuous because "[i]t [was] printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye," *id.* at 856, and the font was surrounded by "comparatively larger font . . . direct[ing] the user's attention everywhere else." *Id.* at 856–57; s*ee* Appendix B (*Berman* websites).

The Court concludes that the SnappyRent2own.com website[8] did not provide reasonably conspicuous notice of the Terms of Use, and that the website is closer to (and arguably worse than) the deficient *Berman* websites, and different from the *Pizarro* website in several material respects. Here, like *Berman*, the text disclosing the Terms of Use is in a very small gray font. *See* Appendix A. Worse than *Berman*, where the notice was two lines of gray text on a contrasting white background, the text here is darker gray against a lighter gray background, and is buried in lines sixteen and seventeen of twenty-one in a full-justified block paragraph. *Id.* The long paragraph begins by stating "By clicking the 'Get Started' button, I am agreeing to," followed by a long list of items before reaching the sentence "In addition, I agree to the Terms of Use . . . ." *Id.* In addition, similar to the websites in *Berman*, "the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text." *Berman*, 30 F.4th at 857; *see* Appendix A (text and images to the left of the textual notice, photographs of properties underneath textual notice, "CHECK LISTINGS" button

---

[7] The other website in *Berman* was formatted slightly differently, but "[a]s with the webpage Hernandez viewed, sandwiched between the buttons allowing Russell to select her gender and the large green 'continue' button were the same two lines of text in tiny gray font stating, 'I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy.' The hyperlinks were underlined but again appeared in the same gray font as the rest of the sentence." *Id.*

[8] The Court's analysis pertains to the version of the website depicted in Exhibit 1 to the Swaminathan Declaration, and not the version that the Court accessed on February 22, 2023.

directly below notice). This design runs contrary to the Ninth Circuit's admonition that "[w]ebsite users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857. Further, "[b]ecause 'online providers have complete control over the design of their websites,' the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* (internal citations omitted).

The Court finds that *Pizarro* does not aid defendants because in that case the notice disclosing the Terms of Use was much more conspicuous. In *Pizarro*, directly below the "See My Rates" button, the website user was notified that "By clicking See My Rates you agree to the following:" followed by "To AmOne's Privacy Notice, Terms of Use, and Consent to Receive Electronic Communications." Both "By clicking See My Rates . . ." and "To AmOne's . . . Terms of Use . . ." were set off by white space, and the text containing the Terms of Use hyperlink was only two lines. *See* Appendix C; *Pizarro*, 2022 WL 3357838, at *1. In contrast, here the notice of the Terms of Use is contained in a long gray-on-gray paragraph and it does not have any distinguishing qualities to make the text conspicuous. *See* Appendix A. In addition, unlike *Pizarro*'s website, which had "only two data fields," was "relatively uncluttered," and "a muted, and essentially uniform, color scheme," *Pizarro*, 2022 WL 3357838, at *3, the SnappyRent2Own.com website has four data fields, multiple colors, pictures, and a more cluttered appearance—all "elements that draw the user's attention away from the barely readable critical text." *Berman*, 30 F.4th at 857.

### B. Terms hyperlink

The Court also finds that the Terms of Use hyperlink is not "readily apparent" to a reasonably prudent user. *Id*. Here, the hyperlink is underlined, but it is not in the traditional blue, nor is it all capitalized or otherwise distinguishable from the surrounding text. *See* Appendix A. "Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.'" *Berman*, 30 F.4th at 857 (quoting *Ngyuen*, 763 F.3d at 1179). "A web designer must do more than simply underscore the hyperlinked text in

8

order to ensure that it is sufficiently 'set apart' from the surrounding text." *Id.*

> Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage.

*Id.* (citing *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 29 (Cal. Ct. App. 2021) (finding "Terms of Service" insufficiently conspicuous because it did not use all capital letters or contrasting font color).

Defendants argue that the Terms of Use hyperlink is readily apparent because it is in the same formatting as the surrounding text, and it is located above the "button to proceed" (the "CHECK LISTINGS" button). Dkt. No. 32 at 3–4. However, when the Terms hyperlink is not conspicuously distinguished from the surrounding text, it is not readily apparent. *Oberstein*, 2023 WL 1954688, at *8 ("And, crucially, the "Terms of Use" hyperlink is conspicuously distinguished from the surrounding text in bright blue font, making its presence readily apparent.").

### II. Manifesting unambiguous assent

The second requirement that must be met in order to enforce DDR Media's online agreement is that "the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856. "The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Id.* at 855 (citing Restatement (Second) of Contracts § 19(2) (1981)). In *Berman*, the Ninth Circuit rejected the defendant's argument that the plaintiffs manifested their assent to be bound by the websites' terms and conditions by clicking large green "continue" buttons:

> [M]erely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything. A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the agreement. The presence of "an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound" is critical to the enforceability of any browsewrap-type agreement. *Nguyen*, 763 F.3d at 1177.
>
> The webpages here did provide advisals concerning the terms and conditions in proximity to the "continue" buttons. On the webpage Russell visited, the notice

appeared directly above the button, and on the webpage Hernandez visited it appeared above the button separated by several intervening lines of text. But "even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice." *Id*. at 1179.

Rather, the notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement. The notice did not do so here. Both webpages stated, "I understand and agree to the Terms & Conditions," but they did not indicate to the user what action would constitute assent to those terms and conditions. Likewise, the text of the button itself gave no indication that it would bind plaintiffs to a set of terms and conditions. This notice defect could easily have been remedied by including language such as, "By clicking the Continue >> button, you agree to the Terms & Conditions."

*Id.* at 857–58.

Here, users are instructed that "By clicking the 'Get Started' button, I am agreeing by my electronic signature . . . . In addition, I agree to the Terms of Use and the Privacy Policy." *See* Appendix A. The long paragraph containing this instruction is followed not by a "Get Started" button, but by a "CHECK LISTINGS" button, and a user reaches a "Get Started Today" button (there is no "Get Started" button) after scrolling past "CHECK LISTINGS" and pictures of various properties. *Id*.

Defendants assert, without any evidence,[9] that a user "would have been required" to click the "CHECK LISTINGS" button in order to proceed through the website, Dkt. No. 29 at 3, and they argue that it is a "technicality" that the relevant assent button is labeled "CHECK LISTINGS" and not "Get Started" as identified in the notice. Dkt. No. 32 at 4. Defendants argue, "there can be no serious dispute that, as a real-world matter, any user of snappyrent2own.com would have been just as aware of the Terms of Use regardless of whether the button . . . read 'CHECK LISTINGS' or 'Get Started.'" *Id.* at 5. Thus, under this theory, a user manifests assent to the Terms of Use by clicking the "CHECK LISTINGS" button, despite the fact that the notice states that agreement is manifested by "clicking the 'Get Started' button." At the hearing on February 17, 2023, defense counsel took a somewhat different position, arguing that inquiry notice does not require a user to click any button, and that a user would be put on notice of the Terms of Use and therefore bound by

---

[9] For example, defendants have not submitted a declaration from the SnappyRent2Own.com web designer stating that a user must click "CHECK LISTINGS" in order to proceed through the website, nor have defendants submitted any evidence showing which buttons, if any, Williams actually clicked.

10

the arbitration agreement contained in the Terms and Conditions simply by visiting the website. Under this latter theory, the Court would presumably analyze the agreement as a pure "'browsewrap' agreement[], in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Berman*, 30 F.4th at 856.

The Court is unpersuaded by defendants' arguments under either theory, and concludes that defendants have not met their burden to show that Williams took some action that unambiguously manifested her assent to the Terms and Conditions. As a threshold matter, the Court finds it problematic that the notice informs users that they agree to the Terms and Conditions by clicking the "Get Started" button, while neither button on the website is labeled "Get Started." Even if Williams clicked the "CHECK LISTINGS" button, as defendants' originally argued, it is the Court's view that doing so would not unambiguously manifest assent to the Terms of Use because the notice informs users that they agree to the Terms of Use by clicking a "Get Started" button, not the "CHECK LISTINGS" button.

Defendants rely on *Hicks/Park LLP v. ING Bank, FSB*, No. CV 11-07330 ODW (AGRX), 2011 WL 5509097 (C.D. Cal. Nov. 9, 2011), to argue that the labeling of the assent button is a "technicality" that should not defeat arbitration. In *Hicks*, a former client sued a law firm over a fee dispute, and the law firm signed a "Notice of Client's Right to Arbitration" and informed the client of its right to mandatory fee arbitration. *Id.* at *1. The client signed a petition for arbitration. *Id.* The law firm later objected to arbitration, arguing that the demand for arbitration was defective because the request was filed against the named partner personally rather than the law firm. The court rejected this argument, holding

> The mere fact that the Notice of Attorney Responsibility is not addressed to HP, but rather "James B. Hicks" does not remove them from the original Petition. . . . Nonetheless, even if it were ambiguous as to whom the demand was filed against, allowing this technicality to defeat Defendant's petition for arbitration would be in direct contradiction to public policy, which recognizes that "states are generally responsible for the regulation of lawyers."

*Id.* at *2. In *Hicks*, there was no dispute as to the parties' agreement to arbitrate, and the case has no bearing on the questions presented here.

11

Further, defendants have not submitted any evidence showing that Williams actually clicked the "CHECK LISTINGS" button. *Berman* explicitly holds that a website user must "take[] some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856. Finally, as to defendants' assertion that Williams manifested her assent to the Terms of Use simply by visiting the website, the Ninth Circuit has repeatedly stated that "[c]ourts are generally reluctant to enforce such agreements because they often leave users 'unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms.'" *Oberstein*, 2023 WL 1954688, at *5 (quoting *Berman*, 30 F.4th at 856).

Because the Court concludes that defendants have not shown that Williams agreed to arbitrate her claims, the Court does not reach the other arguments raised by the parties' briefs, including the question of whether Jornaya has standing to seek arbitration.

## CONCLUSION

For the foregoing reasons and for good cause shown, defendants' joint motion to compel arbitration is DENIED.

**IT IS SO ORDERED**.

Dated: February 28, 2023

SUSAN ILLSTON
United States District Judge

12

APPENDIX A



APPENDIX B




APPENDIX C

