ARAVIND SWAMINATHAN (*admitted pro hac vice*)
aswaminathan@orrick.com
CAROLINE SIMONS (*admitted pro hac vice*)
csimons@orrick.com
REBECCA HARLOW (STATE BAR NO. 281931)
rharlow@orrick.com
THOMAS FU (STATE BAR NO. 325209)
tfu@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

Attorneys for Defendant
Lead Intelligence, Inc. d/b/a Jornaya

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LORETTA WILLIAMS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DDR MEDIA, LLC, a Pennsylvania limited liability company, d/b/a ROYAL MARKETING GROUP, and LEAD INTELLIGENCE, INC., a Delaware corporation, d/b/a Jornaya,<br><br>Defendants. | Case No. 3:22-cv-03789-SI<br><br>**DEFENDANT JORNAYA'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: September 13, 2024<br>Time: 10:00 a.m.<br><br>Judge: Hon. Susan Illston |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on September 13, 2024, at 10:00 a.m., or as soon thereafter as available, in the courtroom of the Honorable Judge Susan Illston, located at 450 Golden Gate Avenue, Courtroom 1, 17th Floor, San Francisco, California 94102 (via Zoom webinar), Defendant Lead Intelligence, Inc., d/b/a/ Jornaya ("Jornaya"), will and hereby does move for summary judgment pursuant to Federal Rule of Civil Procedure 56 and this Court's April 19, 2024 Order, ECF No. 85. This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, any attachments, the pleadings and papers on file in this action, any other such matters of which the Court may take judicial notice, and any other matter that the Court may properly consider.

Jornaya seeks an Order pursuant to Federal Rule of Civil Procedure 56 granting summary judgment in Jornaya's favor and dismissing Jornaya, with prejudice, from the case.

DATED: July 19, 2024

Respectfully Submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: */s/ Aravind Swaminathan*
ARAVIND SWAMINATHAN

Attorneys for Defendant, LEAD INTELLIGENCE, INC. D/B/A JORNAYA

# TABLE OF CONTENTS

Page

I. STATEMENT OF ISSUES TO BE DECIDED ....... 3

II. SUMMARY OF RELEVANT FACTS ....... 3

III. LEGAL STANDARD ....... 7

IV. LEGAL ARGUMENT ....... 7

- A. The undisputed record shows that Jornaya did not read, attempt to read, or learn the contents or meaning of any of Plaintiff's communications. ....... 7
- B. The undisputed record shows that Jornaya was not a third party to Plaintiff's communications. ....... 10

V. CONCLUSION ....... 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .... 7

*Bastidas v. Good Samaritan Hospital LP*,
No. 13-cv-04388, 2016 WL 6834139 (N.D. Cal. Nov. 21, 2016) .... 7

*De Vries v. Regents of the University of California*,
6 Cal. App. 5th 574 (2016) .... 8

*DeGeorge v. U.S. District Court*,
219 F.3d 930 (9th Cir. 2000) .... 8

*Doe v. Kaiser Foundation Health Plan, Inc.*,
No. 23-cv-02862, 2024 WL 1589982 (N.D. Cal. Apr. 11, 2024) .... 2, 11, 12

*In re Facebook, Inc. Internet Tracking Litigation*,
956 F.3d 589 (9th Cir. 2020) .... 8, 10

*James v. Allstate Insurance Co.*,
No. 3:23-cv-01931, 2023 WL 8879246 (N.D. Cal. Dec. 22, 2023) .... 2, 8

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107(9th Cir. 2022) .... 8

*Licea v. American Eagle*,
659 F. Supp. 3d 1072 (C.D. Cal. 2023) .... 11

*Licea v. Vitacost.com, Inc.*,
683 F. Supp. 3d 1118 (S.D. Cal. 2023) .... 11

*Love v. Ladder Financial, Inc.*,
No. 23-cv-04234, 2024 WL 2104497 (N.D. Cal. May 8, 2024) .... 8

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .... 7

*Svenson v. Google Inc.*,
65 F. Supp. 3d 717 (N.D. Cal. 2014) .... 9

*Williams v. What If Holdings, LLC*,
No. C 22-03780, 2022 WL 17869275 (N.D. Cal. Dec. 22, 2022) .... 2

**Statutes**

California Penal Code § 630 .... 9

**Other Authorities**

Oxford English Dictionary, *read*, https://www.oed.com/dictionary/read_v?tab=meaning_and_use#26820196 ........ 8

**Rules**

Federal Rule of Civil Procedure 56 ........ 7

**Treatises**

Restatement (Second) of Torts § 652B (1977) ........ 9

As this Court has previously ruled, for Plaintiff's lawsuit to go forward she must show that Defendant Lead Intelligence, Inc. d/b/a Jornaya ("Jornaya") "'read[], attempt[ed] to read, or [attempted] to learn the contents or meaning of'[Plaintiff's] communication[s]" with snappyrent2own.com, a website operated by Defendant DDR Media, LLC ("DDR Media"). ECF No. 64 at 6–7 (quoting Cal. Penal Code § 631). In her Second Amended Complaint (SAC), Plaintiff attempted to meet that requirement with speculation—pleading various theories that "Jornaya 'must' read or attempt to read the contents of [her] communications" based on the way that Plaintiff imagined Jornaya's technology to work. ECF No. 76 at 4. While this Court held that this was enough (though, only barely) to survive at the pleading stage, it expressed doubt that the same would be true after a "fuller factual record" had been developed, noting that Jornaya had "ma[d]e persuasive arguments" that it "did not," in fact, "read or attempt to read the contents of [Plaintiff's] communications." *Id.* Accordingly, the Court ordered "targeted discovery and an early summary judgment motion"—to take place before class certification—in order to "resolve this question" and potentially end the litigation. *Id.*[1]

That discovery has now been completed—and establishes conclusively that Jornaya did not read or attempt to read the contents of Plaintiff's communications with snappyrent2own.com. Plaintiff must retreat from the theories that she hazarded in the SAC as to why (supposedly) "Jornaya 'must' read or attempt to read the contents of her communications." ECF No. 76 at 4. And for good reason: The undisputed factual record is clear that, far from reading the information Plaintiff entered on snappyrent2own.com (or doing any of the many other things that Plaintiff claimed in her SAC), the ***only*** action Jornaya took with respect to that information was to immediately hash it—*i.e.*, to convert it to an unreadable string of numbers and letters, from which no substantive information can be obtained, whether by Jornaya or by anyone else—and to promptly destroy the original. Plaintiff will likely argue, as a matter of law, that the hashing process itself is Jornaya "reading" Plaintiff's communications. But the relevant law is equally clear and establishes definitively that this kind of fleeting and incidental possession of Plaintiff's data falls well short of what is required to "read …

[1] This motion, filed at the Court's direction, is without prejudice to Jornaya's ability to bring a motion under Rule 56 at a later time in the case should the Court not enter judgment in Jornaya's favor.

the contents" of a communication under Section 631. In fact, courts have held, repeatedly, that a defendant does not "read" a communication—even if it "record[s] the data and store[s] it on its servers" indefinitely—so long as it (like Jornaya) does not try to interpret or understand its substance. *James v. Allstate Ins. Co.*, No. 3:23-cv-01931, 2023 WL 8879246, at *3 (N.D. Cal. Dec. 22, 2023). Because it is now undisputed that Jornaya does far less—it takes no actions to "analyze or use" the recorded information and further destroys it within "milliseconds" rather than storing it, Declaration of Rebecca Harlow ISO Jornaya's MSJ ("Harlow Decl."), Ex. A at 28:23-29:2—there can be no doubt that Plaintiff's Section 631 claim here fails. For this reason alone, Jornaya is entitled to summary judgment.

But the factual record also makes clear that summary judgment is required for a further reason still: Jornaya undisputedly does not "independently 'use[]' the gathered data" for its own purposes, and thus the complained-of activity does not qualify as the kind of eavesdropping "third party" to which Section 631 liability can attach. *Doe v. Kaiser Found. Health Plan, Inc.*, No. 23-cv-02862, 2024 WL 1589982, at *16 (N.D. Cal. Apr. 11, 2024). All agree, for instance, that the manufacturer of a "tape recorder" cannot be liable for wiretapping simply because one of its customers uses such a product to record its own communications; after all, such a manufacturer itself is not truly a third-party eavesdropper, but merely the provider of "a tool that [the customer] use[s] to record its own communications." *Williams v. What If Holdings, LLC*, No. C 22-03780, 2022 WL 17869275, at *3–4 (N.D. Cal. Dec. 22, 2022). And as courts have explained, that same logic applies to any defendant whose products' involvement in recording a communication creates no "materially enhanced risk to [Plaintiff]'s privacy." *Doe*, 2024 WL 1589982, at *16–17. That is exactly the case here: With Jornaya possessing Plaintiff's communications for only the briefest of instants—long enough only to convert it to a form that cannot be used by anyone, even Jornaya, to extract any information about Plaintiff whatsoever—Jornaya has created no "materially enhanced risk to [Plaintiff]'s privacy," and so falls outside Section 631's purview. *Id.* For this reason, too, the record makes clear that Plaintiff's Section 631 claim must fail.

This case must thus at last be brought to an end. Plaintiff has had more than ample opportunity to learn exactly what Jornaya's software does—and, more importantly, does not do—

with her data. And that discovery has served only to underscore that Plaintiff's theory was unavailing from the incept. The record is clear that Jornaya does not read or attempt to read the contents of Plaintiff's communications with snappyrent2own.com, and that (for similar reasons) Jornaya makes no independent use of Plaintiff's data. This case thus falls well outside of Section 631, so summary judgment must be granted in Jornaya's favor, and Jornaya must be dismissed from the case.

## I. STATEMENT OF ISSUES TO BE DECIDED

Jornaya seeks an order pursuant to Federal Rule of Civil 56 granting summary judgment in Jornaya's favor.

## II. SUMMARY OF RELEVANT FACTS

Plaintiff filed this lawsuit in June 2022 alleging that a piece of software created by Jornaya, called TCPA Guardian, unlawfully intercepted her "name, address, and phone number" when she typed them into the website snappyrent2own.com, which is owned and operated by Defendant DDR Media, LLC. ECF No. 1 (Complaint) at ¶¶ 21, 22. On that basis, Plaintiff asserted that Jornaya violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; and the California Constitution. *See* ECF No. 43 (First Amended Complaint). This Court dismissed all of Plaintiff's claims. ECF No. 64. In so doing, this Court explained that Plaintiff's allegations established only that Jornaya was "akin to a tape recorder vendor" rather than "an eavesdropper," and that it could "think of no sense in which Jornaya has read, attempted to read, or learned the contents or meaning of [a] communication," which was fatal to Plaintiff's claims. ECF No. 64 at 7.

In response, Plaintiff amended her pleading, dropping two of her original three claims (under the UCL and the California Constitution), but adding new allegations that Jornaya "**must** read and learn the content of the" name, address, and phone number that she typed into snappyrent2own.com "in order to function," because it "cannot work any other way." SAC ¶ 30 (emphasis in original). While the Court held that those allegations were enough to survive a motion to dismiss, because the Court was "required to take the allegations of the SAC as true," it noted that Jornaya made "persuasive arguments about why [it is] not liable," which could well prevail on a "fuller factual

record." ECF No. 76 at 4. The Court went on to express its "view that targeted discovery and an early summary judgment motion could resolve this question." *Id.*

That discovery now shows definitively that Jornaya does not—and indeed, cannot—read or learn any of the information input by a visitor on a website like snappyrent2own.com. *See, e.g.*, Harlow Decl., Ex. B ¶ 6 ("Jornaya cannot (and does not) read, learn, or store any of the information, including PII, input by the visitor on the website."). That is because all data entered by the user is immediately "hashed" as soon as it is transmitted from the website to Jornaya's servers. Harlow Decl., Ex. C at 7–8 (Response to Interrogatory No. 6).

"Hashing" is a process that applies an algorithm to a string of characters of any length to create a fixed-size output made up of a new string of numbers and letters. Harlow Decl., Ex. B ¶ 8. To say that the output is "fixed-size" means that "the number of characters" in the output "does not depend on the size or number of characters of the input"—*e.g.*, the inputs "1" and "supercalifragilisticexpialidocious" will both produce (different) outputs of the same length. *Id.* ¶¶ 10–12. That said, while the *length* of the outputs does not change with the inputs, the numbers and letters that comprise that output will vary hugely, even with very small changes in the input. *Id.* ¶ 12. For instance, the figure below shows how even adding a single space to an email address—*i.e.*, "test@example.com" versus "test@example.com "—can produce vastly different hashes:

**Example 1: Using MySQL to hash a single email address**

```
SELECT SHA2('test@example.com', 256) as email01;
```

RESULT:

| email01 |
|---|
| 973dfe463ec85785f5f95af5ba3906eedb2d931c24e69824a89ea65dba4e813b |

**Example 2: Using MySQL to hash a single email address with trailing whitespace**

```
SELECT SHA2('test@example.com ', 256) as email02;
```

RESULT:

| email02 |
|---|
| 1f0a3bbdda1b7eb2c6688ac0ff5213b8e1fdc6cb9b0e419314262e0c98e8b517 |

***Note***: *The resulting hash completely changes by adding a single space before applying the hashing algorithm.*

*Id.* ¶ 12.

Of especial importance here, hashes are "irreversible." Harlow Decl., Ex. A at 31:21–22. (In cryptographic terms, hashes are thus known as a "'one-way' cryptographic function." Harlow Decl., Ex. B ¶ 13.) That means that "there is no 'key' that can unlock the hash, nor is there a second algorithm that can be applied to turn the hash code back into the data that originally went into the algorithm." *Id.* In this way, hashing "is more protective than encryption." *Id.*

"One of the core benefits of hashing is the ability to validate that two inputs are exactly the same, without having to read, learn, or know what the inputs are themselves." *Id.* A common example is passwords. *Id.* ¶ 14. Storing passwords in "plain text" presents obvious security risks: If a malicious actor were able to gain access to such a list of stored login credentials, it could compromise the security of innumerable systems (especially since individuals often reuse the same credentials for multiple applications). *Id.* Accordingly, passwords are almost always stored only in hashed form—meaning that when an individual creates a username and password, only the hash of the password (not the password itself) is stored. *Id.* Later, when the user inputs their password in an attempt to log in, the application will hash that input and compare it to the stored hash code to see if they match. Because the hash codes will match only if the two inputs were the same—*i.e.*, if the password entered was the same as the password created—this allows the application to verify whether a user entered the correct password without storing the password itself:




*Id.* Thus, the site the user is logging into does not need to know what the password is, just that the text that is entered is the same as what was entered when the password was created.

Because Jornaya designed its services to be privacy-forward, Jornaya's TCPA Guardian product (at issue here) works in this same way. TCPA Guardian is most often used by "lead-sellers" and "lead-buyers" to facilitate compliance with the federal Telephone Consumer Protection Act of

1991. *Id.* ¶ 16. A "lead-seller" usually is a company that operates a website that might offer to provide information about a certain product or service (*e.g.*, a mortgage), generating engagement from website visitors. *Id.* In a typical scenario, the visitor interested in that product or service provides certain information about themselves to the lead-seller on the website in order to receive more information about the products or services advertised. *Id.* If a lead-seller places Jornaya's "LeadiD Create script on its website, a LeadiD will be generated from the visit, and the hash code of the information provided by the website visitor to the [website] is stored by [Jornaya, and specifically its TCPA Guardian product] and associated with that LeadiD." *Id.* This then allows a lead-buyer to use TCPA Guardian to validate information about the individual who visited the lead-seller's website in conjunction with the disclosures that were present on the website at the time of the visit, particularly whether the website obtained consent from the visitor to communicate with him or her. *Id.* Here is how that works. The lead-buyer "submits the LeadiD [associated with the visit] to Jornaya's TCPA Guardian, along with the hash code for the information" (*i.e.*, the name and phone number) from that visit that they wish to verify. *Id.* ¶ 17. If the hash codes of the data submitted by the lead-buyer match the hash codes stored by TCPA Guardian, then the lead-buyer knows that the underlying data (*i.e.*, the name and telephone number) matches as well, and the lead-buyer can gain confidence that the name and phone number that they are considering are the same as the name and phone number entered into the lead-seller's website. *Id.* If the hashes do not match, then they know that the underlying data does not match either. *Id.* By storing the hash—and only the hash—of a website visitor's input, Jornaya can allow lead-buyers to confirm that the data they bought from the lead-seller is indeed the data that a website visitor originally provided to the lead-seller, without Jornaya actually keeping, reading, or learning the original data." *Id.*

Jornaya performs that hashing of user-inputted data as soon as the data transmitted from the website reaches Jornaya's servers—indeed, at the first instant that Jornaya can do so securely. Harlow Decl., Ex. A at 30:17–22. And "once the hashing algorithm is applied," the "original data is discarded," *id.* at 28:17–20, and "is not used" for "any purpose," *id.* at 26:19–27:9. User-inputted data is thus held by Jornaya for only "milliseconds"—*i.e.*, just long enough to perform that hashing—before it is destroyed. *Id.* at 27:8–9. Indeed, precisely because Jornaya makes no use of

the user-inputted data, and never attempts to read or learn its contents, Jornaya ensures that the data is "never stored on any persistent medium." *Id.* at 28:23–29:2. Rather, it is cached only briefly "in volatile memory"—*i.e.*, memory that is constantly being rewritten. *Id.* at 28:23–29:2.

That is all to say that the record now makes indisputably clear that rather than reading the contents of Plaintiff's communications, Jornaya did the opposite—immediately converting the data encoding those communications into a format in which they cannot be read by anyone, including Jornaya itself.

## III. LEGAL STANDARD

A defendant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has met its "initial burden of demonstrating the absence of a genuine issue of material fact," the "burden shifts to the nonmoving party to 'set forth … specific facts showing that there is a genuine issue for trial.'" *Bastidas v. Good Samaritan Hosp. LP*, No. 13-cv-04388, 2016 WL 6834139, at *3 (N.D. Cal. Nov. 21, 2016) (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence … will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Similarly, "conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Bastidas*, 2016 WL 6834139, at *3.

## IV. LEGAL ARGUMENT

### A. The undisputed record shows that Jornaya did not read, attempt to read, or learn the contents or meaning of any of Plaintiff's communications.

As relevant here, a defendant cannot be liable under Section 631 if it does not "'read[], or attempt[] to read, or to learn the contents of meaning of' [a] communication." ECF No. 64 at 6–7 (quoting Cal. Penal Code § 631(a)). And, as this Court recognized, a defendant "reads … the

contents or meaning of [a] communication" only if it gains some understanding of the communication's substance, such as by "analyz[ing] or us[ing] a recorded communication," ECF No. 64 at 7; merely allowing data that encodes a communication to pass across the defendant's equipment does not fit that bill. Indeed, even if a defendant maintains such data indefinitely—such as when a company "record[s] [a] communication for retrieval by a party to that same communication"—it still does not "read" a communication within the meaning of Section 631 unless it actively attempts to understand or interpret its meaning. *Id.*; *see also, e.g.*, *James*, 2023 WL 8879246, at *3 (no Section 631 violation where defendant merely "recorded the data and store[d] it on its servers"); *Love v. Ladder Fin., Inc.*, No. 23-cv-04234, 2024 WL 2104497, at *1 (N.D. Cal. May 8, 2024) (similar).

That basic principle flows from the text of Section 631 itself, which provides no specialized definition for "read" and so requires courts to apply the term's ordinary meaning, *DeGeorge v. U.S. Dist. Court*, 219 F.3d 930, 936 (9th Cir. 2000); *De Vries v. Regents of Univ. of Cal.*, 6 Cal. App. 5th 574, 591 (2016), which requires gaining some understanding or interpretation of a message's substantive contents. As the Oxford English Dictionary explains, the ordinary meaning of "read," generally, is "to look over or scan … ***with understanding of what is meant*** by the letters or signs." Oxford English Dictionary, *read*, https://www.oed.com/dictionary/read_v?tab=meaning_and_use#26820196 (emphasis added). What is more, in the specific context at issue here—"reading" of "information in an encoded form"—it means "to scan ***and interpret***." *Id.* (emphasis added). The statute's text alone thus makes clear that a defendant violates Section 631 only if it understands or interprets (or attempts to do so) the meaning of a communication.

That same conclusion follows from the statute's history and purpose. As the Ninth Circuit has explained, "the legislative history … demonstrate[s] that … the California legislature intended to protect … historical privacy rights when [it] passed" Section 631. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020). Specifically, Section 631 was meant to "codif[y] the common law tort of invasion of privacy." *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022) (Bumatay, J., concurring). Indeed, the legislature wrote that purpose directly into the statute itself, explaining that the law was meant to combat "the invasion of

privacy" that came about as a result of eavesdropping. Cal. Penal Code § 630. No privacy invasion occurs, however, if a defendant merely possesses data encoding an individual's communication, but never attempts to understand or interpret its contents: A postal carrier, for instance, does not violate an individual's privacy rights simply by carrying a letter, so long as he refrains from reading its contents. *See* Restatement (Second) of Torts § 652B (1977) (citing *Vernars v. Young*, 539 F.2d 966, 969 (3d Cir. 1976)).

Here, the undisputed evidence is clear that Jornaya does nothing remotely like trying to understand or interpret the contents of any communication by a user. It is undisputed that Jornaya receives and hashes only data such as Plaintiff's name, address, and phone number, which "record information" is not considered the contents of a communication for purposes of Section 631. *See Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 729 (N.D. Cal. 2014) (explaining that "names, mailing addresses, phone numbers" are not "contents" of a communication). To the contrary, the record establishes that, in hashing user-entered data, "Jornaya does not read or store any data, including personally identifiable data (PII), that a visitor may type or input into a website that is running the LeadiD Create JavaScript." Harlow Decl., Ex. C at 5–6 (Response to Interrogatory No. 3); Harlow Decl., Ex. B ¶ 6. That is because as soon as the information is transmitted from the website to Jornaya's cloud servers—*i.e.*, at the first instant that Jornaya can do so securely, Harlow Decl., Ex. A at 30:17–22—it is "automatically hashed and the ***hash only*** is stored on Jornaya's servers." Harlow Decl., Ex. C at 3–4 (Response to Interrogatory No. 1) (emphasis added). Jornaya, in other words, does ***nothing*** with the data input by a user except to transform it, via hashing, into a format that "cannot be reversed back to the original input" by anyone, including Jornaya itself. Harlow Decl., Ex. A at 25:1–4.

Just as important, the fact that Jornaya has programmed a script to automatically process the data on its cloud server does not mean that Jornaya is reading the data because the hashing algorithm itself does nothing to read, understand, or interpret the contents of the data. To the contrary, the hashing algorithm is entirely agnostic to—and indeed, unaware of—anything about the meaning of the data being hashed. That is because the algorithm simply "takes a byte array, which is a collection of numerical values as the input and then it produces a numerical output." *Id.* at 57:1–3. The

algorithm does not know, and does not care, whether the numerical values on which it is operating represent a name, an email address, an image, a piece of software, or pure randomness. Harlow Decl., Ex. B ¶ 8 & n.1. Moreover, the hashing algorithm employed by Jornaya breaks apart the input data into segments as it hashes it, rendering it incomprehensible even an attempt were made to read and make sense of it at any point in the process. Decl. of Manny Wald ISO Jornaya's MSJ, ¶ 5. In fact, "[h]ashing can actually be applied to any file because ultimately all files are simply reducible to a serious of 1's and 0's," and the hashing itself does not depend in any way on what kind of data those 1's and 0's represent. Harlow Decl., Ex. B ¶ 8 & n.1

What is more, "once the hashing algorithm is applied," the "original data is discarded," Harlow Decl., Ex. A at 28:17–20, and "is not used" for "any purpose," *id.* at 26:19–27:9. Indeed, the data "received by the server" is ephemeral; only ever "stored in volatile memory"—*i.e.*, memory that is constantly being rewritten—and "never stored on any persistent medium." *Id.* at 28:23–29:2. As a result, any information input by the user "is quickly overwritten by other data," and is thus incapable of being used or read by Jornaya (or anyone else). *Id.* at 28:23–29:2. This "entire process"—from data acquisition, through hashing, and then deletion—"occurs within milliseconds." *Id.* at 27:8–9.

The evidentiary record thus thoroughly—and undisputedly—refutes any suggestion that Jornaya reads or attempts to read the contents of Plaintiff's communications. For this reason alone, summary judgment must be granted.

### B. The undisputed record shows that Jornaya was not a third party to Plaintiff's communications.

The record also makes clear that Jornaya is entitled to summary judgment for a second reason: It is not a third-party eavesdropper, as is required to be liable under Section 631, but rather the mere supplier of a tool that its users can employ for their own purposes.

Courts have long held that Section 631 "'appl[ies] only to eavesdropping by a third party'"; it does not cover "a participant"—even one who "record[s]" the communication. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 607 (quoting *Warden v. Kahn*, 99 Cal. App. 3d 805, 811 (1979) (explaining that a § 631 claim "is without merit" when brought against a participant to a

communication)). The law is equally clear that when a "service provider" records the content of its user's communications "for [its user's] own purposes," it acts as "an extension of" the user itself. *Licea v. Vitacost.com, Inc.*, 683 F. Supp. 3d 1118, 1123 (S.D. Cal. 2023) (collecting eight other cases making this same point). Accordingly, if the user is a participant in the recorded communications, and hence "not a third-party eavesdropper," then the same is true of the service provider. *Id.* (dismissing claim against technology provider for this reason).

That makes sense. If the service provider does not make its own "independent use of" the recorded content—such as by "reselling" it, *Licea v. Am. Eagle*, 659 F. Supp. 3d 1072, 1083 (C.D. Cal. 2023)—then it merely "provides a tool … that allows [its user] to record and analyze its own data in aid of [the user's own] business," *Vitacost.com*, 683 F.Supp. 3d at 1123 (quoting *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832-33 (N.D. Cal. 2021)). Such a service provider is thus no different than the manufacturer of "a tape recorder," who obviously cannot be liable any time someone who purchases its product chooses to record a conversation with it. *Id.* That is in part because of the absurdity of such a consequence—imposing sweeping criminal liability on the manufacturers of essential technologies, based on how other people use them—and in part because applying Section 631 in that way would do nothing to further its objectives. As explained above, *see supra* pp. 8–9, the goal of Section 631 was to protect privacy rights. And if a company simply provides a tool to allow a participant to record a communication, while making no independent use of the communication of its own, there is no "materially enhanced risk" that "the individual's privacy will be compromised." *Doe*, 2024 WL 1589982, at *17. Accordingly, there is no reason to apply Section 631's privacy-focused prohibition to such a situation. (This contrasts with a situation where a "third party could use the information gathered for other purposes," beyond the user's "control," which does pose "a greater risk that the individual's privacy will be compromised," and hence is sensibly subject to Section 631's strictures. *Id.*)

Here, the record is clear that Jornaya makes no independent use of an individual's data, and that the operation of Jornaya's TCPA Guardian product poses no "materially enhanced risk to the individual's privacy." *Doe*, 2024 WL 1589982, at *17. That is because, as explained above, any information entered by a website visitor is immediately hashed. It is undisputed that once that data

is hashed there is no "ability for Jornaya to take that hash and … untangle it to reveal" the original, unhashed data, "due to the irreversible nature of how hashes work." Harlow Decl., Ex. A at 31:15–31:22. The hashed data thus cannot be used by Jornaya—or anyone else—to learn anything about a person or the information they entered into a website, meaning that Jornaya's possession of that hashed data thus poses no "enhanced risk to the individual's privacy." *Doe*, 2024 WL 1589982, at *17. The same is true of the original data as well, which is deleted and overwritten "within milliseconds," Harlow Decl., Ex. A at 27:8–9—with Jornaya's ephemeral servers holding onto it just long enough for the hash to be performed, *id.*—and "not used" for "any purpose," *id.* at 26:19–27:9. Indeed, by the time anyone could even think to look for the original data, it would have been long gone. This too ensures that there is no "enhanced risk to the individual's privacy." *Doe*, 2024 WL 1589982, at *17.

The record thus makes clear that, as far as Section 631 is concerned, Jornaya is even less an interloping third party than the manufacturer of a tape recorder, whom all agree cannot be liable under the statute. If a tape recorder is stolen (or otherwise wrongfully accessed), the thief could listen to its recordings and learn something potentially private about the individuals recorded. The same is not true of the data hashed by Jornaya here: If someone wrongfully obtained access to the hashed data held by Jornaya, it would be useless to them. Hashes are "irreversible." Harlow Decl., Ex. A at 31:21–22. They "cannot be reversed back to the original input." *Id.* at 25:1–4. And so even if someone did access the hashcodes held by Jornaya, they would be able to do nothing with it—and, to the point here, could learn nothing at all private about the individual to whom it pertained (or indeed, even to which individual it pertained at all). *See id.* at 59:21–60:9. For this separate reason, too, Jornaya cannot be liable under Section 631, and so is entitled to summary judgment.

## V. CONCLUSION

For the foregoing reasons, this Court should grant Jornaya's motion for summary judgment and dismiss Jornaya from the case with prejudice.

DATED: July 19, 2024

Respectfully Submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: */s/ Aravind Swaminathan*
ARAVIND SWAMINATHAN

Attorneys for Defendant, LEAD INTELLIGENCE, INC. D/B/A JORNAYA